UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LIONEL SMITH                                          CIVIL ACTION

VERSUS                                               NUMBER: 15-0170

CAROLYN W. COLVIN, ACTING                            SECTION: "J"(5)
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration ("SSA") denying Plaintiff's application for Supplemental Security Income ("SSI") benefits.  (Rec. docs. 14, 15).

Lionel Smith, Plaintiff herein, filed the subject application for SSI benefits on October 5, 2012, with a protective filing date of September 28, 2012, alleging disability as of July 1, 2010 or January 31, 2011.  (Tr. pp. 99-104, 114).[1/]  In a "Disability Report-Adult" form that is part of the record below, the condition limiting Plaintiff's ability to work was identified as a gunshot wound to the back below the heart that was swelling.  (Tr. p. 118).  It was further explained on that form that Plaintiff had been released from his most recent job on December 31, 2011 because he "needed to be off" but that his condition ultimately became severe enough to prevent him from working on July 1, 2012.  (Id.).  Plaintiff's application for SSI benefits was denied at the initial step of the Commissioner's administrative review process

---

[1/] While Plaintiff's application for SSI benefits contains an alleged disability onset date of July 1, 2010, a "Disability Report-Field Office" form that appears in the administrative record below bears an alleged onset date of January 31, 2011 as well as a "[p]otential [o]nset [d]ate (if different from above) … [of] 07/01/2012, DI."  (Tr. pp. 99, 114).  In her written decision of November 12, 2013, the ALJ identified the alleged onset disability date as January 31, 2011.  (Tr. p. 9).

on February 9, 2013. (Tr. pp. 65-68). Pursuant to Plaintiff's request, a hearing *de novo* before an Administrative Law Judge ("ALJ") went forward on October 10, 2013 at which Plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 69-71, 25-52). On November 12, 2013, the ALJ issued a written decision in which she concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 6-24). The Appeals Council ("AC") subsequently denied Plaintiff's request for review of the ALJ's decision on November 21, 2014, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 1-4). It is from that unfavorable decision that the Plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In his cross-motion for summary judgment, Plaintiff frames the issues for judicial review as follows:

(1) The ALJ ignored a medical opinion indicating Smith has a marked limitation in concentration, persistence, or pace – a limitation that a vocational expert testified is disabling.

(2) The ALJ failed to apply proper legal standards when evaluating whether Smith meets Listing 12.05 for Mental Retardation and substantial evidence does not support the ALJ's finding.

(3) Substantial evidence does not support the finding of no limitations from gunshot residuals.

(4) The ALJ found Smith not disabled based on drug use without performing the required evaluation, and improperly presumed Smith not credible because of drug use.

(5) The ALJ found Smith not disabled because he is capable of performing "past relevant work," when the record establishes Smith has no "past relevant work."

(6) The ALJ asserted that vocational expert testimony established Smith was capable of performing other work given his RFC, when the record contains no such VE testimony.

(Rec. doc. 14-1, p. 1).

Relevant to the issues to be resolved by the Court are the following findings that were made by the ALJ:

> (1) The claimant has not engaged in substantial gainful activity since September 28, 2012, the application date (20 CFR 416.971 *et seq.*).
>
> (2) The claimant has mild deficit to borderline intellectual functioning which is a severe condition within the constraints of *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985) & SSR 96-3p. (20 CFR 416.924(c)).
>
> (3) The claimant does not have a condition or combination of conditions that meet or medically equal the severity of one of the listed conditions in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926). Specifically, Listings 12.02 Organic Mental Disorders and 12.05 Intellectual Disability are not met.
>
> (4) After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:  Claimant's work must be of a simple, routine repetitive nature.
>
> (5) The claimant has past relevant work and is capable of returning to past relevant work of grill cook.  (20 CFR 416.965).
>
> (6) The claimant has not been under a disability, as defined in the Social Security Act, since September 28, 2012, the date the application was filed or at any time through the date of this decision.  (20 CFR 416.920(g)).

(Tr. pp. 11, 12, 17, 19, 21).

Judicial review of the Commissioner's decision to deny SSI benefits is limited under

42 U.S.C. §405(g) to two inquiries:  (1) whether substantial evidence of record supports the

Commissioner's decision and  (2) whether the decision comports with relevant legal

3

standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420 (1970). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues *de novo*, nor may it substitute its judgment for that of the Commissioner. *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts. *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking SSI benefits bears the burden of proving that he is disabled within the meaning of the Social Security Act. *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§423(d)(1)(A) and 1382c(a)(3)(A). Once the claimant carries his initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. *Harrell*, 862 F.2d at 475. In making this determination, the Commissioner uses the five-step sequential analysis set forth in 20 C.F.R. §416.920, as follows:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made; and.

5. If an individual's impairment precludes him from performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must ultimately demonstrate that he is unable to perform the work that he has done in the past. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987). In determining whether a claimant is capable of performing the work that he has done in the past, the ALJ is required to assess the demands of the prior work and to compare those demands to the claimant's present capabilities. *Villa*, 895 F.2d at 1022; *Hollis v. Bowen*, 837 F.2d 1378, 1386 (5th Cir. 1988); *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980). The assessment of the demands of a claimant's prior work ". . . may rest on descriptions of past work as actually performed or as generally performed in the national economy." *Villa*, 895 F.2d at 1022 (citing *Jones v. Bowen*, 829 F.2d 524, 527 n.2 (5th Cir. 1987)). If the claimant carries his burden and successfully demonstrates that he is unable to perform the work that

he has done in the past, the burden of proof shifts to the Commissioner at the fifth step to show that the claimant can perform other work in light of his age, education, work experience, and physical and mental limitations. *Kramer v. Sullivan*, 885 F.2d 206, 208 (5th Cir. 1989). In determining whether there is other work available that the claimant can perform, the Commissioner may rely on the Medical-Vocational Guidelines of the Regulations when the claimant suffers only from exertional impairments or when his non-exertional impairments do not significantly affect his residual functional capacity. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Fraga*, 810 F.2d at 1304. Alternatively, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. *Fraga*, 810 F.2d at 1302.

Pursuant to the SSA's request, on October 10, 2012, Plaintiff completed a "Function Report-Adult" form that is designed to elicit information about how his injuries limited his activities. There, Plaintiff indicated that he suffered from back pain as a result of a gunshot wound that caused swelling, with the embedded bullet effecting the side of his body like somebody was punching him. An average day was described by Plaintiff as rising with his daughter at 6:00 a.m., watching TV with her, taking a walk to the store, eating, and retiring for the evening. He was able to feed, change, and bathe his daughter, sometimes assisted by his girlfriend when he was in pain. When asked what he was able to do before his injuries that he was no longer able to do, Plaintiff identified "sleep, work, play sports, and work out." Bending over to tie his shoes caused pain and swelling and standing up for long periods of time was problematic. Plaintiff was able to cook meals such as tacos and macaroni and clean up after his daughter but activities like vacuuming, sweeping, and mowing the lawn caused

back pain.  He was also able to walk and to use public transportation to go to the store or appointments and he shopped once per month for food, clothing, medication, and things for his daughter.  Hobbies and interests included playing sports and games and watching TV and Plaintiff socialized daily with his girlfriend and daughter but tended to stay inside.  Plaintiff indicated that his injuries affected a variety of his abilities, being able to walk five to 10 minutes before needing to stop and rest for three to four minutes.  Plaintiff was unable to finish what he started but could sufficiently follow written and spoken instructions and could get along with authority figures.  He could handle stress and changes in routine but sometimes experienced violent dreams.  Plaintiff used no assistive devices but did receive help from his girlfriend.  (Tr. pp. 124-134).

The medical evidence generated during the relevant time period begins with the report of a consultative evaluation that was performed on November 5, 2012 by Dr. Janet Higgins of Internal Medicine Associates of New Orleans.  Plaintiff's major complaints at the time were a gunshot wound to the back and learning difficulties.  In terms of the latter, Plaintiff reported dropping out of school in the eleventh grade after repeating both the eighth and ninth grades as a result of learning difficulties.  At the age of 20, Plaintiff had suffered gunshot wounds to the left arm, the chest area near the heart, and the back.  He complained of pain in the chest, primarily when taking deep breaths and with movement, and pain in the lower and upper thoracic areas as well as low back pain.  Plaintiff advised Dr. Higgins that he had previously worked on a sanitation truck and as a grill cook, both part time temporary jobs, experiencing difficulty with employment because of discomfort.  He was on no medications at the time.  Despite suffering the multiple gunshot wounds in 2007, Plaintiff had not undergone any surgical procedures and had been involved in no other significant

accidents or injuries.  He had experimented with marijuana in the past but had reportedly stopped several months earlier.

Upon physical examination, Plaintiff's chest was normal in function.  He had normal gait and station and normal range of motion in the neck but diminished range of motion of the lower back.  Plaintiff could heel-to-toe walk and straight leg raising was negative bilaterally.  The cardiovascular exam was normal.  There was crepitus and a diminished range of motion to the left knee, possibly from an old injury, but no edema or color change and all other joints were normal in appearance with a full range of motion.  Numerous scars were noted over the axilla, the left chest, and the lower thoracic area.  Examination of the mid-thoracic area revealed a firm mass approximately the size of a baseball thought to possibly be a muscular change as a result of Plaintiff's injuries.  Swelling at the site of another scar was felt to be a bullet in the upper lumbar area.  All totaled, there were at least four major scars in addition to the firm mass to the mid-thoracic area lateral to the thoracic spine at approximately T7 that was painful with motion.  A neurological exam was normal.  In terms of mental status, Plaintiff appeared to have a low-average IQ with fair understanding, concentration, attention, and memory.  Cooperation was good but range of information was limited.  Plaintiff complained of being depressed as a result of difficulty supporting his three children with a fourth on the way.  He could perform all activities of daily living without restrictions but tended to stay at home and did no driving.

As part of the consultative evaluation, various radiographic studies were conducted.  A chest x-ray revealed no evidence of active pulmonary or cardiac pathology but mild dorsal scoliosis to the right was present as well as a pleural diaphragmatic adhesion on the left.  X-rays of the thoracic spine demonstrated mild dorsal scoliosis with a metallic foreign body

being noted posteriorly within the left upper abdomen.  Studies of the lumbar spine revealed slight lumbar scoliosis.  Based upon the results of her evaluation, Dr. Higgins diagnosed Plaintiff as suffering from the following:  1) a gunshot wound to the left axilla, left chest, and the thoracic and lumbar spine area; 2) a firm mass in the upper mid posterior thoracic area for which further evaluation was appropriate; and 3) a probable learning disability with low-average IQ.  Aside from reports of pain to the back, the upper thoracic area, and to the chest with motion and sometimes deep breaths, the results of the evaluation were largely unremarkable except for diminished range of motion to the spine and back and to the left knee with no pain.  IQ testing was recommended.  (Tr. pp. 183-191).

On February 1, 2013, Plaintiff underwent a consultative psychological evaluation by Dr. Scuddy Fontenelle, III.  Plaintiff arrived for the evaluation via public transportation and advised the doctor that he lived with his mother.  He further reported having attended special education classes in the Orleans Parish Public School System until dropping out during the ninth grade as a result of multiple behavioral and learning problems.  Plaintiff had previously worked at McDonald's, Wendy's, and Cannon's Restaurant as a dishwasher, having last worked as a grill cook at Krystal's until December of 2012 when he was terminated for leaving work early to be present for the birth of his child.  Past medical history was positive for gunshot wounds to the left arm and chest in 2007 and right lateral temporal headaches.  In terms of legal issues, Plaintiff had previously been arrested for possession of cocaine as well as domestic violence and a probation violation, serving 12 months in prison. He had never been married but had three children with three different girlfriends whom he was unable to support.

In connection with the evaluation, Plaintiff was administered the Wechsler Adult Intelligence Scale IV ("WAIS-IV") test to assess his cognitive abilities. During that testing, Plaintiff achieved a verbal comprehension score of 68, a perceptual reasoning score of 77, a working memory score of 80, a processing speed score of 79, and a full scale score of 69, scores that were in the mild-borderline and low-average ranges of intelligence. Plaintiff had good motivation and cooperation and there was no evidence of a thought disorder. Thought content was generally focused on Plaintiff's medical problems and health condition, which included occasional abdominal pain and chronic daily headaches. There were no perceptual abnormalities, mood was euthymic, and affect was animated, but Plaintiff experienced feelings of inadequacy as a result of being unable to adequately care for his children. Verbal reasoning and problem solving skills appeared good as was personal insight. Fund of general knowledge was somewhat diminished.

From a functional standpoint, speech and social skills were within normal limits and Plaintiff was able to tend to his personal needs, to make routine purchases, and to use public transportation independently (as he had no driver's license). He had reportedly taken the driving test on multiple occasions but was unable to pass. Plaintiff was able to follow routine job instructions and had had good relationships with coworkers and supervisors. The diagnostic impressions were as follows: Axis I-polysubstance abuse by history, in remission per self report; Axis II – learning disorder, not otherwise specified, and mild deficit to borderline intellectual functioning; Axis III – refer to medical report; Axis IV – mild stressors; and, Axis V - a GAF of 48. Plaintiff was thought to be capable of managing funds. (Tr. pp. 193-197).

As noted above, on February 19, 2013, Plaintiff's application for SSI benefits was denied at the initial level of the Commissioner's administrative review process. (Tr. pp. 65-68). In connection with that initial determination, Plaintiff's file as it was then extant was reviewed by, among others, Dr. Lisette Constantin of the SSA who conducted a Psychiatric Review Technique ("PRT") assessment, weighing the evidence of record against the criteria of Sections 12.02, 12.05, and 12.09 of the Listing of Impairments. In doing so, Dr. Constantin found that Plaintiff had a mild restriction in the activities of daily living; mild difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and, no repeated episodes of compensation, each of extended duration. The doctor also performed a Mental Residual Functional Capacity ("MRFC") assessment, finding that Plaintiff was markedly limited in understanding and remembering detailed instructions but was not significantly limited or was only moderately limited in various other non-exertional abilities. In making those findings, Dr. Constantin offered the following explanation:

> Despite cognitive limitations, clt would be expected to be able to remember and understand simple instructions, attend for sufficient lengths of time and exert appropriate CPP to complete tasks. Clt should also be able to relate adequately to peers and supervisors and adjust to routine changes in the work place. Overall the evidence indicates that the claimant retains the capacity to perform the basic functions of unskilled work that can be learned on the job following a short job demonstration.

(Tr. pp. 54-64).

On March 27, 2013, Plaintiff presented to the Ochsner Westbank Campus Emergency Department ("ED") but left without being seen. (Tr. p. 259). The following day, he was seen at the Touro Infirmary ED for complaints of non-radiating intermittent chest pain for the previous three weeks. The pain was rated as a "3" on a scale of "1" to "10" and was

aggravated by repositioning.  The hospital record was positive for tobacco and marijuana use.  Plaintiff's heart rate was normal, rhythm was regular, and no pulse deficits were appreciated.  Chest x-rays were taken and an EKG was performed.  Plaintiff was administered aspirin, Norco, and Motrin on site.  Ultimately, he was discharged home in good condition with a diagnosis of pericarditis of unknown etiology and chest pain and was prescribed Anaprox.  (Tr. pp. 220-227).

Plaintiff returned to the Touro ED on March 30, 2013, this time complaining of a migraine headache for the previous month and a half as well as a three-week history of chest pain.  Tobacco and marijuana use were again noted.  Plaintiff was treated with Fioricet and a "GI cocktail" without Tylenol and was later discharged in stable condition with a diagnosis of acute headache and GERD and prescriptions for Fioricet and Pepcid.  Just like his ED visit of two days earlier, chest x-rays taken at this time were normal.  (Tr. pp. 211-219).

On April 10, 2013, Plaintiff was seen again at the Ochsner Westbank ED for his continued complaints of chest pain and a migraine headache, reporting that Naproxen and Pepcid were not working and that Fioricet was only effective for five minutes.  Elsewhere in the records that were generated at this visit Plaintiff was reported as saying that his migraine medication was "moderately effective."  A respiratory exam was significant for decreased breath sounds on the left as compared to the right but was otherwise unremarkable.  Based upon x-ray evidence and EKG test results, it was felt that the ballistic fragment abutting Plaintiff's left hemidiaphragm could be contributing to his pleuritic-like chest pain.  The diagnosis was non-cardiac chest pain.  No discharge instructions were provided.  (Tr. pp. 249-258).

The next set of medical records document Plaintiff's visit to Westbank Urgent Care on June 1, 2013 for complaints of chest pain/pressure on the chest.  He also reported being short-tempered, stressed due to financial and personal matters, and experiencing anxiety, fatigue, and dizziness.  Medications at the time included Famotidine, Fioricet-Codeine, Mobic, and Tylenol-Codeine.  Upon physical examination, Plaintiff was observed to be in obvious distress and anxious with an angry mood and worried that he may hurt someone.  Axillary lymphadenopathy/upper extremity lymphangitis was noted as was tenderness to the posterior of the chest where bullets were still lodged.  The diagnosis was chest discomfort/pressure/tightness, malaise/fatigue, homicidal ideation, and headache for which Plaintiff was hydrated, administered injections of Toradol and Benadryl, and was prescribed Valium, Cannula nasal spray, and oxygen therapy.  (Tr. pp. 199-206).  Prescriptions for Fluoxetine and Lorazepam were also written on this date.  (Tr. p. 207).  Later that same day Plaintiff presented to the Ochsner Westbank ED but refused to wait for treatment and left against medical advice.  (Tr. pp. 247-248).

On July 30, 2013, Plaintiff was seen by Dr. Michael Friley of the West Jefferson Medical Center ("WJMC") Family Doctors group for the purpose of establishing a relationship with a primary care physician, a painful lump in the middle of the back, and headache and tooth pain.  Medical history was positive for gunshot wounds in 2007 with a projectile being lodged in the subcutaneous area of the back over the right T11 disc, poor dentition, and depression as a result of numerous deaths, most notably his brother's suicide in his presence.  Medications at the time consisted of Lexapro, Vibra-Tabs, and Tramadol.  The diagnosis included dental caries, major depression, and a history of gunshot wounds.  Plaintiff was issued refills for Lexapro, Vibra-Tabs, and Tramadol.  (Tr. pp. 264-268).

Plaintiff returned to Dr. Friley on August 30, 2013 with the chief complaints being identified as back pain and headaches.  Plaintiff also related symptoms of post-traumatic stress related to the suicide of his brother.  The diagnosis was PTSD, a history of gunshot wounds, and depression.  Plaintiff was referred to the Louisiana Family Health Services and was prescribed Lexapro, Librium, and Tramadol.  (Tr. pp. 261-263).

On September 17, 2013, Plaintiff returned to the Ochsner Westbank ED complaining of anxiety and chest tightness after smoking marijuana, having initially gone to the Urgent Care Clinic and subsequently being transported to Ochsner via ambulance.  A physical examination was essentially normal and x-rays revealed no acute findings.  The diagnosis was chest pain of uncertain etiology.  No treatment was administered.  (Tr. pp. 236-246).

The final medical records that were admitted in the administrative proceedings below document another visit, via ambulance, to the Ochsner Westbank ED on September 27, 2013 for complaints of left-sided chest and shoulder pain since September 16, 2013, along with nausea and dizziness, symptoms related to Plaintiff's gunshot wounds in 2007. Routine testing was done including x-rays, bloodwork, and an EKG, the latter results of which were characterized as abnormal when compared with similar testing on September 17, 2013.  Unfortunately, the medical records from this date contain no diagnosis, discharge summary, or treatment plan.  (Tr. pp. 229-235).

As noted earlier, a hearing *de novo* before an ALJ went forward on October 10, 2013. After the documentary exhibits were admitted into evidence Plaintiff's counsel made an opening statement in which he argued that Plaintiff had sustained multiple gunshot wounds in the past, retaining a bullet in his left upper abdomen with resulting back and chest pain. Plaintiff also suffered from headaches and depression and had received a full scale score of

14

69 on IQ testing.  Counsel argued that said IQ score, coupled with Plaintiff's back and chest pain, satisfied the criteria of Section 12.05(C) of the Listing of Impairments.  (Tr. pp. 27-29).

Plaintiff then took the stand and was questioned by the ALJ.  He was 26 years old at the time and had completed eight years of formal education, doing best with math and reading but less so with other subjects.  Plaintiff testified that he initially failed, but ultimately passed, the eighth grade, explaining that his relocation to Texas following Hurricane Katrina was a substantial factor in his not completing high school.  He had pondered getting a GED on several occasions but had not followed through on it, something he had not mentioned to his doctor.  Plaintiff then elaborated briefly on the circumstances under which he had been shot.  When directed to his past work history, Plaintiff testified that the jobs he had applied for were initially supposed to be full time but ultimately did not last that long.  Such work included a temporary stint as a sanitation worker and a job as a grill cook which he had been terminated from after leaving to attend the birth of his child.  Since then, Plaintiff had supposedly applied for work through a "temp service," landing a dishwashing job at Xavier University not too much earlier but being unemployed and supported by his girlfriend at the time of the hearing.

In terms of daily activities, Plaintiff spent the majority of his time inside supervising his children.  When asked why he was unable to work, Plaintiff testified that he experienced pain and swelling to the back as a result of a lodged bullet fragment that had recently been confirmed as being stuck in a rib.  He took Tramadol as needed for pain relief which was very effective.  Plaintiff was receiving no mental health treatment at the time.  At this point in the hearing, the ALJ queried Plaintiff's counsel on the significance of the protective filing date of September 28, 2012 as there was no medical evidence that was generated around that time.

The ALJ also acknowledged the full scale score of 69 Plaintiff had achieved on IQ testing but said that the score was subject to a 10-point variance in either direction.

Upon further questioning by the ALJ, Plaintiff testified that he could grocery shop, use public transportation, and bathe and dress himself.  Contrary to the "Work History Report" that he had completed where he indicated that three of his past jobs involved "flip[ping] burger[s]," Plaintiff testified that he had never worked as a cook.  It had been a month and a half since he had last used marijuana which he generally consumed three times per week, even when he was working, being 12 or 13 the first time he tried it.  Plaintiff had also served a 10-month sentence for a probation violation.  In response to the ALJ's inquiry, Plaintiff's counsel acknowledged that the medical records gave no clear indication of the severity of the pain that Plaintiff suffered.  He had attended a drug treatment while on probation but used marijuana subsequent to that.  (Tr. pp. 29-41).

Mary Catherine Elvir, a VE, was the next witness to take the stand.  The ALJ proceeded to pose a hypothetical question to Elvir which assumed an individual of Plaintiff's age, education, and work experience who suffered from mild to moderate pain due to a gunshot wound in the distant past for which he took pain medication that had no effect on persistence, pace, or concentration.  Before answering that question, the VE first proceeded to classify  Plaintiff's past jobs as a grill cook and dishwasher as involving medium, unskilled work; that as a parking industry attendant as involving light, unskilled work; and, that as a sanitation worker as involving very heavy, unskilled work.  With those classifications in mind, Elvir testified that the individual described in the hypothetical question could perform all of the jobs that Plaintiff had done in the past.  The ALJ then modified the hypothetical question to add mild to moderate depression, not interfering with persistence, pace, or

concentration and not under active treatment.  Faced with that second hypothetical question, the VE testified that the four jobs Plaintiff had previously worked could still be performed. To a third hypo, the ALJ added daily marijuana consumption, a couple of times per day, two or three times per week until a month and a half earlier.  While deferring to the opinions of a physician as to effect on motivation, attention, and concentration, the VE testified that employers generally frown upon employees working while under the influence.  (Tr. pp. 41-48).

Upon questioning by his attorney, Plaintiff testified to swelling and a lump in his back which became painful on repositioning.  Through further testimony, it was revealed that Plaintiff had been referred to a psychologist but had never followed through on that. Although Plaintiff's girlfriend supported him, that was accomplished through her receipt of child's SSI benefits and Section 8 housing as she was also unemployed.  (Tr. pp. 48-50). Plaintiff's counsel then posed a hypothetical question to the VE which was the same as the ALJ's first one but the pain was marked and more than moderate and resulted in a marked limitation to concentration, persistence, and pace.  After the ALJ interjected to emphasize that no doctor had opined about the level of pain that Plaintiff was experiencing, the VE admitted that none of Plaintiff's past jobs could be performed if he suffered from marked pain that resulted in a marked limitation in the ability to maintain attention and concentration, persistence, and pace.  There would also be no other jobs that the individual described in counsel's hypothetical question could perform.  (Tr. pp. 50-52).

As noted earlier, Plaintiff challenges the Commissioner's decision to deny SSI benefits on six separate grounds.  In the fifth of those grounds, Plaintiff argues that the ALJ erred in concluding that he was capable of performing his past relevant work because he has no "past

17

relevant work" as that phrase is defined by the Regulations.  Finding that challenge to have merit, it will be recommended, for the reasons that follow, that Plaintiff's case be remanded to the Commissioner for further proceedings.

At step four of the sequential analysis under §416.920, the ALJ found that "[t]he claimant has past relevant work and is capable of returning to past relevant work of grill cook."  (Tr. p. 19).  Past relevant work refers to work that was performed within the last 15 years, lasted long enough for the person to learn to do it, and was "substantial gainful activity" ("SGA").  20 C.F.R. §416.965(a).  SGA, in turn, refers to work activity that is both substantial and gainful, terms that are defined as follows:

> (a) *Substantial work activity*.  Substantial work activity is work activity that involves doing significant physical or mental activities.  Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility.
> (b) *Gainful work activity*.  Gainful work activity is work activity that you do for pay or profit.  Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized.

The Regulations further provide that the Commissioner will consider all of the medical and vocational evidence in a claimant's file to decide whether or not he has the ability to engage in substantial gainful activity.  20 C.F.R. §416.971.  Generally, if a claimant worked for substantial earnings, he will be found to be able to do substantial gainful activity.  20 C.F.R. §416.974(a)(1).  However, the fact that a claimant's earnings were not substantial will not necessarily show that he is not able to do SGA.  *Id.*

The Commissioner will consider that earnings demonstrate SGA if a claimant's monthly earnings exceed those set forth in 20 C.F.R. §416.974(b)(2).  If earnings are below the amounts in §416.974(b)(2), the Commissioner "… will generally consider …" that the

claimant has not engaged in SGA and "... will generally not consider other information in addition to [] earnings ..." 20 C.F.R. §416.974(b)(3). There are, however, several exceptions to the latter rule. 20 C.F.R. §416.974(b)(3)(ii). More specifically, the Commissioner will normally consider information beyond earnings if there is evidence indicating that the claimant may be engaging in substantial gainful activity or that the claimant is in a position to control when or the amount of the earnings that are paid to him. *Id.* Examples of other information that the Commissioner may consider include whether the work is comparable to that of unimpaired people in the community who are doing the same or similar work or when the claimant's work, although significantly less than that done by unimpaired people, is clearly worth the threshold amounts set forth in the Regulation. 20 C.F.R. §416.974(b)(3)(iii)(A) and (B). Whether this is the extent of the other information that the Commissioner may consider is not indicated.

In *Copeland v. Colvin*, 771 F.3d 920, 925-27 (5th Cir. 2014), the Fifth Circuit, following the leads of the Tenth and Third Circuits, found that a rebuttable presumption of non-SGA arises when a claimant's earnings fall below the guidelines for SGA contained in §416.974(b)(2). For 2007, the countable earnings that would presumptively be considered to be not substantial were those that averaged less than $900 per month, for 2008 less than $940 per month, for 2009 less than $980 per month, and for 2010 and 2011 less than $1,000 per month. POMS DI 10501.015, Table 2. Because the ALJ in the *Copeland* case did not "substantively discuss" the claimant's earnings, the Fifth Circuit remanded the case to the Commissioner to consider why the claimant, despite her low earnings, was nonetheless able to engage in SGA and was thus not entitled to Social Security benefits. *Copeland*, 771 F.3d at 927. Other courts that have considered the issue have reached the same conclusion. *See, e.g.*,

*Brown v. Colvin*, No. 13-CV-13917, 2015 WL 1530769 at *5-6 (E.D. Mich. March 31, 2015)(and cases cited therein).

According to the certified earnings statement that was filed in the record below, Plaintiff earned $1,268.26 in 2007, $3,198.95 in 2008, $1,209.47 in 2009, $1,026.99 in 2010, and $3,059.32 in 2011.  (Tr. p. 111).  Those annual amounts, when averaged out over the course of the particular years, fall well below the threshold amounts that would be presumptively considered "substantial" under the Regulations.  In finding that Plaintiff was capable of returning to his past relevant work as a grill cook, the ALJ stated as follows:

> He last worked as a grill cook, however, wages were not indicative of gainful employment due to period work.  The undersigned finds that such was gainful employment for the time worked as it was not sheltered work he was performing the work successfully.  He did not work for a subsidized program.

> (Tr. pp. 19-20).

Nowhere, however, did the ALJ substantively discuss Plaintiff's earnings as a grill cook, nor did she apply the presumption that Plaintiff's past work was not "substantial gainful activity."  While the Court might ordinarily find this error harmless in light of the ALJ's apparent but un-numbered fifth-step finding, that Plaintiff was able to perform other jobs that existed in significant numbers in the national economy based upon the testimony of the VE, the VE in fact offered no testimony to support such a finding at the administrative hearing.  (Tr. pp. 20, 41-48, 50-51).  Additional statements that appear in the ALJ's decision also lack apparent evidentiary support or contradict the evidence adduced.[2/]  For all these

---

[2/] By way of example, contrary to Dr. Constantin, the state agency psychological consultant whose opinions are presumably of a conservative nature, the ALJ stated at two portions of her written decision that Plaintiff could either "follow" or "comprehend, carry out and remember" detailed instructions (tr. pp. 15, 16), whereas Dr. Constantin found that Plaintiff was "markedly limited" in his "ability to understand and remember very short and simple instructions."  (Tr. 61-62).  Other statements that appear to be inaccurate or that cast the Plaintiff in an overly generous light include his being "... independent in living his life successfully in the community,"

reasons, and consistent with the Fifth Circuit's opinion in *Copeland*, it will be recommended that Plaintiff's case be remanded to the Commissioner for further proceedings.

## **RECOMMENDATION**

For the foregoing reasons, it is recommended that Plaintiff's case be remanded to the Commissioner for further proceedings consistent with this opinion.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996)(en banc). [3/]

New Orleans, Louisiana, this 22nd day of _____ February _____, 2016.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

---

looking both ways before crossing the street, his ownership and independent use of a washer and dryer, being "oriented in the world of work," his ability to complete job applications and to interview well, his ability to scour the Times Picayune and to identify available local opportunities for work, and his being "keen and efficient in his concentration, attention span, and immediate retention and recall," possessed of "excellent skills in his employment of reason and logic." (Tr. pp. 14-16). In light of Dr. Fontenelle's findings that Plaintiff could only identify 10 months and three seasons out of a year and his inability to spell the words "world" and "table" in reverse, some of these statements appear suspect to say the least. Plaintiff also reported to Dr. Fontenelle that he had attempted to take the driving test on "multiple occasions" but was apparently unable to pass.

[3/] *Douglass* referenced the previously-applicable 10-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to 14 days.